UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LUIS BURGOS-CINTRON a/k/a LUIS BURGOS, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 09-4470 |
| v. | : | OPINION |
| AUGUSTUS NYEKAN, JR., JAMES SOUTH, MARK CUNARD, RICHARD BUMBERA, NEW JERSEY DIVISION OF STATE POLICE, NEW JERSEY DIVISION OF STATE POLICE - STRATEGIC INVESTIGATIONS UNIT, STATE OF NEW JERSEY, and JOHN DOES 1-10,[1] | : : : | |
| Defendants. | : | |

RODRIGUEZ, Senior District Judge:

This is a civil rights action stemming from the allegedly unlawful arrest, imprisonment, and prosecution of Plaintiff Luis Burgos-Cintron.  Plaintiff asserts that he was wrongfully imprisoned for over ten months as a result of Defendants' violation of his rights.  Through this action, he seeks "attorney's fees and costs, compensatory, statutory, and punitive damages," as well as "equitable, injunctive and other relief." (Compl. ¶ 1.)  Before the Court is Defendants' motion for summary judgment.  Oral argument on the motion was heard September 13, 2011, and the record of that proceeding is incorporated here.  For the reasons given that day, as well as those set forth below, the motion will be granted.

---

[1]Also named as Defendants in the original Complaint were the Camden City Police Department and City of Camden.  Both were dismissed from the case by Stipulation and Order dated January 4, 2010, after Plaintiff stipulated to voluntarily dismiss these Defendants on December 23, 2009.

In addition, the Court notes that the Complaint describes I. Edward Fallon, a detective with the U.S. Marshal's Service Fugitive Task Force, as a "non-party," (Compl. ¶ 8), but then goes on to caption certain counts as asserted against Fallon.

<u>Background</u>

Plaintiff has alleged that on October 4, 2007, he received a phone call from his sister stating she and Plaintiff's mother separately had been contacted that day by unknown members of the New Jersey State Police Strategic Investigations Unit ("SIU") and U.S. Marshal's Service Fugitive Task Force ("Task Force"), indicating that they were looking to speak with Plaintiff regarding an attempted murder.  Plaintiff went to his mother's house and returned the Task Force call, speaking to Fallon.  Plaintiff assured Fallon that he had not had any role in an attempted murder; a mistake must have been made.  In response, Fallon allegedly advised Plaintiff to remain at his mother's house so that he could be picked up to go the Camden County Prosecutor's office to clear up the confusion.

The Complaint alleges that Defendants James South, a Detective Sergeant First Class with the SIU, and Mark Cunard, a Detective Sergeant with the SIU, then went to Plaintiff's mother's house, knocked on the door and asked for Plaintiff, and proceeded to arrest him when he appeared.  At his deposition, Plaintiff testified that he was arrested by Cunard and Defendant Nyekan.  The arresting officers allegedly did not ask Plaintiff any questions or tell him why he was being arrested, despite his demands for information.  Instead they allegedly told Plaintiff, "you know you did it."  (Compl. ¶ 28.)[2] The officers also allegedly advised Plaintiff that his "accomplice," Joseph Thompson, had already been arrested and whoever "talked" first would "get the best deal."  Plaintiff had no idea what had occurred, and did not know of Thompson.

---

[2]Plaintiff has alleged that during the arrest, in response to Plaintiff's family's request for information regarding why Plaintiff was being arrested, Cunard gave the middle finger to Plaintiff's family and friend, including his sister and mother, and stated that Plaintiff was going to jail for a long time.  (Compl. ¶ 35.)

After his arrest, Plaintiff learned of the circumstances that led the authorities to arrest him.  In or around 2001, Plaintiff used "Luis Santiago" as an alias in an attempt to avoid criminal prosecution for drug charges.  The attempt failed, and Plaintiff was arrested under that name, charged, and imprisoned as a result of his actions.  On or about September 15, 2007, the Camden City Police Department began to investigate the attempted murder of Kareem Parker.  On that date, Parker had gotten into a physical altercation with Thompson.  At some point during the altercation, an individual identified as Luis Santiago pulled a gun from his waist and began firing at Parker. Plaintiff notes that he does not own a gun.  In addition, the description of Santiago provided to the Police Department's Officer Hendricks was a Hispanic male, 5 feet tall, with braids in his hair.  (Incident Report, Ex. A to Complaint.)  In contrast, Plaintiff is approximately 6 feet tall, weighs approximately 270 pounds, and at all times material had short, cropped hair.

At some point, the investigation of the above 2007 incident was transferred from the Camden City Police Department to the State Police, where Defendants Richard Bumbera, a Detective Sergeant, and Augustus Nyekan, Jr., a trooper, took over the investigation on September 18, 2007.  On September 20, 2007, Bumbera and Nyekan went to Parker's house to interview him regarding the shooting.  Parker was hesitant to speak "on the record," but identified the suspects as Thompson and Santiago, including that he went to high school with the two.  (Bumbera Dep., p. 10-11.)

In addition, Bumbera and Nyekan identified a witness to the above incident, George Brown, Sr., from a surveillance video and Brown's presence during Bumbera and Nyekan's interview of Parker.  Brown also identified the suspects as Thompson and

3

Santiago and gave a sworn statement that he went to high school with the two and has known them since that time.  (Supplementary Offense Report, Ex. B to Complaint.)

Nyekan wrote, "Photos of Thompson and Santiago were generated [at the "shoot team office"] through PictureLink and shown to Brown [and Parker] to confirm their identity.  Brown confirmed the photos by informing us that he grew up with them and know who they are."  (Id.)  Bumbera testified that Parker also said, "I went to school with them.  I went to school with them.  I know them.  I know them my whole life.  I know who they are."  (Bumbera Dep., p. 11.)  On October 1, 2007, Nyekan prepared a warrant for the arrest of Luis Santiago and forwarded it to the State Police Fugitive Unit.

Plaintiff has learned that Parker, Brown, Santiago, and Thompson attended Camden High School.  Plaintiff also attended Camden High School, beginning in or around 1996 and leaving approximately two years later, prior to Parker, Brown, Santiago, and Thompson's attendance.  Thus, Plaintiff did not go to school with Parker, Brown, or Thompson.  Further, Plaintiff has testified that he does not know Parker, Brown, Santiago, or Thompson.

Brown further told Bumbera and Nyekan that he and Santiago had been involved in an verbal dispute on September 13, 2007, in New Jersey at the same store where the attempted murder occurred.  Plaintiff alleges that he supplied the prosecutor with information showing that on September 13, 2007, he was working in Philadelphia, Pennsylvania during the alleged altercation between Brown and Santiago.  Plaintiff also alleges that he supplied the prosecutor with statements from family members and friends who stated that Plaintiff was with them from approximately 1:30 p.m. until 9:30 p.m. on the date of the shooting, which occurred at or around 2:30 p.m.

4

Further, Plaintiff asserts that Bumbera and Nyekan used unduly suggestive identification procedures to Brown, in that they did not follow the New Jersey Attorney General's Guidelines established to improve police procedures and to ensure the accuracy of identifications.  Per the Guidelines, Plaintiff contends that the lineup should have included a photo that resembled the suspect's description or appearance at the time of the incident if multiple photos of the suspect are reasonably available.  Bumbera and Nyekan showed Brown only one photograph of Plaintiff, taken at or around his 2003 release from jail for the 2001 drug offenses.  Plaintiff alleges that this photograph did not substantially portray how Plaintiff looked at that time (2007), as the photograph showed Plaintiff's hair in braids.  When Plaintiff was arrested in 2001, his hair was cropped short, as it was again in 2007.   Although Bumbera and Nyekan interviewed Parker, they did not coordinate a lineup or photograph identification from Parker for Thompson or Santiago.

Plaintiff also asserts that according to the Attorney General's Guidelines, a double-blind procedure is to be conducted for photo identification, meaning the officer conducting the photo array should have nothing to do with the case and not know who the suspect is.  In the 2007 investigation at issue, however, Bumbera and Nyekan showed Brown the photograph of Plaintiff.  In addition, although the Attorney General's Guidelines provide that a photograph array should include at least five non-suspects, Bumbera and Nyekan used only one photo.

Finally, Plaintiff alleges he volunteered to have a lie detector test conducted as well as a live lineup, but these were refused.  Plaintiff asserts that he supplied alibi information, birth records, school transcripts, and witness statements, all of which was disregarded.

After his arrest, Plaintiff's bail was set at approximately $200,000.00, which he could not afford.  As a result, Plaintiff was incarcerated in the Camden County Jail.  In April 2008, Plaintiff's bail was reduced to $100,000.00, which sum Plaintiff still could not afford.  He was charged by the State with six offenses, including attempted murder, multiple counts of aggravated assault, and multiple counts of possession of a weapon for unlawful purpose; the charges were supported by an affidavit from Nyekan.  Criminal charges against Plaintiff were withdrawn on July 10, 2008.  Shortly before a <u>Wade</u> hearing was to be held concerning Plaintiff's identification, Kareem Parker viewed Plaintiff's photo and stated that it was not the correct Luis Santiago.  Parker subsequently identified another photo as being one of the shooter.  Parker informed Nyekan that he did not know why he originally identified Plaintiff's photo as that of the shooter, but "that's not him."  (Nyekan Dep., p. 30.)

Plaintiff filed the Complaint in this matter on August 28, 2009.  On January 7, 2009, the State of New Jersey and New Jersey Division of State Police filed a motion for summary judgment.  As part of the instant motion, Defendants point out that Plaintiff's counsel signed a stipulation of dismissal on December 23, 2010, dismissing with prejudice all claims made against Defendant Cunard and any allegations that could be construed as claims made against Edward Fallon.  Further, Plaintiff stipulated to the dismissal with prejudice of Counts V (selective prosecution), VI (<u>Monell</u>), and VII (conspiracy).  Finally, as part of his opposition to this motion, Plaintiff has voluntarily withdrawn several claims.  These include: his <u>Monell</u> claim as set forth in Count VI of the Complaint; all claims against Defendants Nyekan, Bumbera, and Fallon in their official capacities; his claims against Defendants South and Cunard, with prejudice; and

6

the due process claim made in Count III of the Complaint.  Plaintiff opposes the dismissal of his 4th and 14th Amendment claims and state law claims arising out of his malicious arrest.  It appears, then, that the instant motion pertains to the following remaining claims:

> Count I - malicious prosecution by Defendants Nyekan and Bumbera, in their individual capacities, in violation of Plaintiff's Fourth and Fourteenth Amendment rights, in that these Defendants instituted a criminal action against the Plaintiff, supported by an affidavit, after conducting an unlawful and suggestive photo identification and failing to properly investigate the incident, without probable cause;

> Count II - false arrest by Defendants Nyekan and Bumbera, in their individual capacities, without probable cause;

> Count IV - false imprisonment by Defendants Nyekan and Bumbera, in their individual capacities, without probable cause;

> Count VIII - false arrest/imprisonment by Defendants Nyekan and Bumbera, in their individual capacities, willfully and without probable cause, in violation of State law;

> Count IX - malicious prosecution by Defendants Nyekan and Bumbera, in their individual capacities, without probable cause and supported by a false affidavit, due to Plaintiff's race, in violation of State law;

> Count X - conspiracy by Defendants Nyekan and Bumbera, in their individual capacities, to interfere with Plaintiff's rights under the New Jersey Constitution.[3]

Discussion

A.  <u>Summary Judgment Standard</u>

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d

---

[3]No argument was presented regarding this count.

7

471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986));

accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a

movant who shows that it is entitled to judgment as a matter of law, and supports the

showing that there is no genuine dispute as to any material fact by "citing to particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . admissions, interrogatory

answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

   An issue is "genuine" if supported by evidence such that a reasonable jury could

return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a

dispute about the fact might affect the outcome of the suit.  Id.  In determining whether

a genuine issue of material fact exists, the court must view the facts and all reasonable

inferences drawn from those facts in the light most favorable to the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

   Initially, the moving party has the burden of demonstrating the absence of a

genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once

the moving party has met this burden, the nonmoving party must identify, by affidavits

or otherwise, specific facts showing that there is a genuine issue for trial.  Id.;

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to

withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the

moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon

mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.

8

Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot

be genuinely disputed by showing that "an adverse party cannot produce admissible

evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord

Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

B.  Governing Law

Plaintiff's Constitutional claims are governed by 42 U.S.C. § 1983.  A plaintiff may

have a cause of action under 42 U.S.C. § 1983  for certain violations of his or her

constitutional rights.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Thus, a plaintiff must demonstrate two essential elements to maintain a claim under

section 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that the plaintiff was deprived of his rights by a person acting under the color of state law.  See Parratt v. Taylor, 451 U.S. 527, 535 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994); Williams v. Borough of West Chester, 891 F.2d 458, 464 (3d Cir. 1989).

Where an amendment provides explicit protection against a particular kind of government action, that amendment is the source of the Court's evaluation of a § 1983 claim rather than the general rights granted by the Fourteenth Amendment.  County of Sacramento v. Lewis, 523 U.S. 833, 841 (1998) (citing Albright v. Oliver, 510 U.S. 266, 273 (1994)).  Thus, allegations of malicious prosecution, false arrest or false imprisonment are evaluated under the Fourth Amendment rather than the Fourteenth Amendment.  See, e.g., United States v. Lanier, 520 U.S. 259, 272 (1997); Berg v. County of Allegheny, 219 F.3d 261, 268-69 (3d Cir. 2000).

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, support by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

To establish malicious prosecution under § 1983, a Plaintiff must establish that: (1) the defendant initiated a criminal proceeding; (2) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding; (3) the criminal prosecution resulted in plaintiff's favor; (4) the proceeding was initiated

without probable cause; and (5) the defendant acted maliciously[4] or for a purpose other than bringing the plaintiff to justice.  DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005); Santiago v. City of Vineland, 107 F. Supp. 2d 512, 566 (D.N.J. 2000). To prove a claim for unlawful arrest, a Plaintiff must show that he or she was arrested without probable cause.  Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997).

Probable cause exists where "'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Schneider, 749 A.2d at 349-50 (citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).  When considering whether probable cause exists, the Court must look at the "totality of the circumstances." Id. at 350 (citing Illinois v. Gates, 462 U.S. 213, 230-31 (1983)).  Probable cause is less than proof needed to convict, but more than mere suspicion.  Id.  A police officer can defend a § 1983 claim by establishing: (1) that he or she acted with probable cause; or, (2) if probable cause did not exist, that a reasonable police officer could have believed it existed.  Kirk v. City of Newark, 536 A.2d 229, 234 (N.J. 1988) (citing Anderson, 483 U.S. at 663-64). "Probable cause exist[s] if 'at the moment the arrest was made . . . the facts and circumstances within [the defendants'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the plaintiff] had violated" the law.  Hunter v. Bryant, 502 U.S. 224, 228 (1991) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

---

[4] "Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." Morales v. Busbee, 972 F. Supp. 254, 261 (D.N.J. 1997).

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Saucier v. Katz, 533 U.S. 194, 202 (2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (2006).  "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity.  Couden, 446 F.3d at 492 (internal citations omitted).  Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).  See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The

12

general touchstone is whether the conduct of the official was reasonable at the time it occurred.).  Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant.  See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

C.  Analysis

Regarding Count I, the defense has argued that the criminal proceedings against the Plaintiff were initiated by Nyekan alone, as he was the individual who prepared and signed the affidavit, complaint, and warrant, although Bumbera did assist Nyekan in the investigation.  They also argue that neither Defendant acted with malice in issuing the complaint and warrant for Plaintiff's arrest.  As to all counts of the Complaint, the Defendants further argue that they had probable cause to arrest and prosecute Plaintiff "based upon the facts known to them at the time, including the identification of the plaintiff by the victim of the alleged crimes and an eyewitness thereto."  (Def. Br., p. 20.) They stress that probable cause for the issuance of a warrant for arrest was found by a judicial officer on September 26, 2007, and the Grand Jury returned an indictment of the Plaintiff in November of 2007,[5] and the victim did not retract his identification of the Plaintiff as the shooter until July 2008.  Finally, the Defendants argue that they are entitled to qualified immunity because they had probable cause, or a reasonable belief in the existence of probable cause, to issue a complaint and warrant for Plaintiff's arrest.

"When a police officer has received a reliable identification by a victim of his or

_____

[5] A grand jury indictment or presentment constitutes prima facie evidence of probable cause to prosecute.  Pittman v. McDuffy, 240 Fed. Appx. 524, 527 n.6 (3d Cir. 2007) (citing Rose v. Bartle, 871 F.2d 331, 353 (3d Cir. 1989)).

13

her attacker, the police have probable cause to arrest." Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997). In this case, the Defendants relied on information provided by the victim and an eyewitness who both claimed to have had personal knowledge of the suspect. The officers had no reason to doubt the veracity of the identification presented to them. In addition, there is nothing in the record that tends to indicate that any exculpatory evidence was presented to Defendants Nyekan or Bumbera prior to Plaintiff's arrest. Therefore, the Defendant officers were "not required to undertake an exhaustive investigation in order to validate the probable cause that, in [their] mind[s], already existed." Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 709 n.8 (3d Cir. 2000). Further, Plaintiff has admitted that he does not know whether any of his alibi information or his request for a lineup was passed on to the trooper defendants after he was incarcerated. (Burgos-Cintron Dep., p. 64, 82.)

In explaining why there was no photo array or line up, Nyekan stated, "I was confirming identification because Kareem Parker and George Brown already said they knew the individuals. . . . If the victims didn't know the person, then we would have comprised a lineup based on descriptive factors. But since they knew exactly who the suspects were, there was no need for it." (Nyekan Dep., p. 39-40.) Similarly, Bumbera stated, "if the victim was positive as to the identification of the suspect, I would not do a photo array." (Bumbera Dep., p. 23.)

Based on the record before this Court, Plaintiff's remaining claims against Bumbera and Nyekan cannot survive summary judgment. The officers were reasonable in their belief that probable cause existed to arrest the Plaintiff.

14

<u>Conclusion</u>

Accordingly, Defendants' motion for summary judgment is hereby granted.  An appropriate Order will be issued.


Dated: September 19, 2011                         /s/ Joseph H. Rodriguez
                                                   Joseph H. Rodriguez
                                                   U.S.D.J.

15